**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LYTX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | Honorable _____ |
| STEVEN SANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff LYTX, INC. complains against Defendant STEVEN SANDERSON and asserts causes of action for: (1) violation of the Illinois Trade Secrets Act ("ITSA") (Count I); (2) violation of the Federal Stored Wire and Electronic Communications and Transactional Records Act ("Stored Communications Act") (Count II); (3) anticipatory breach of contract (Count III); and (4) conversion (Count IV), and alleges as follows:

**SUMMARY OF THE CASE**

1.      Defendant Steven Sanderson ("Sanderson") is a former employee of Plaintiff Lytx, Inc. ("Lytx").  Sanderson recently left Lytx to work in a nearly identical sales role for Lytx's direct competitor, SmartDrive Systems, Inc. ("SmartDrive").  (*See* Sanderson Public LinkedIn Profile, attached as **Exhibit A**.)  After Sanderson accepted employment with SmartDrive, he repeatedly lied to Lytx, and stole and destroyed Lytx's confidential and proprietary information stored on his work computer before returning the computer to Lytx.  (*See* Declaration of Tonya Cross ("Cross Dec."), attached as **Exhibit B**, ¶¶ 44-46; Declaration of Doron Lurie ("Lurie Dec."), attached as **Exhibit C**, ¶¶ 24-25.)

2.      Lytx brings this action for injunctive relief and damages to stop Sanderson from wrongfully possessing, using, and disclosing Lytx's trade secrets and confidential information

("Confidential Information")[1] in connection with his employment at SmartDrive. Lytx's Confidential Information gives Sanderson and SmartDrive an unfair competitive advantage in the marketplace and will enable them to free-ride on Lytx's intellectual property, and, in turn, steal Lytx's clients and prospective clients. (Lurie Dec. ¶¶ 7-12, 26.)

3.     Lytx is a global leader in video-based driver safety. It develops and delivers solutions that improve driver performance by changing human behavior. Through its DriveCam® Programs (DC Enterprise™, DC Highway™ and DC Protect™), Lytx identifies and addresses the causes of risky driving behavior by collecting vehicle and driver data and combining it with predictive analytics to help its clients be safer on the roads, thereby saving lives. In addition, Lytx offers RAIR® Compliance Services, which assists DOT-regulated fleets in complying with safety regulations. (Cross Dec. ¶ 3; Lurie Dec. ¶ 3.)

4.     Sanderson resigned from Lytx via email on January 19, 2015, 12 days after he received the final installment of his $30,000 sign-on bonus. Sanderson's supervisor emailed Sanderson that same day and asked to speak with him about his decision. Sanderson responded via email and said he would call, but he never did. For the next week, despite repeated attempts by Lytx management to reach Sanderson, he failed to respond to any telephone calls or emails. He also failed to comply with Lytx's numerous demands to immediately return his company-issued laptop, iPad, and hot spot until January 29, 2015, after he downloaded and then deleted contents from his laptop. (Cross Dec. ¶¶ 22, 24-36, 42-46; Lurie Dec. ¶¶ 16-17, 19-23.)

5.     After Sanderson resigned, Lytx learned he had accepted an offer to work for SmartDrive, a direct competitor of Lytx. Sanderson signed an offer letter on January 14, 2015, but did not inform Lytx that he had accepted employment with SmartDrive, even when he resigned five days later on January 19, 2015. (Cross Dec. ¶ 45; Lurie Dec. ¶¶18, 25.)

---

[1] Lytx's trade secrets and Confidential Information are described in detail in Paragraphs 24, 26, and 31 herein.

6.      On numerous occasions (at least three times) after Sanderson's resignation on January 19, 2015 and as late as January 29, 2015, Sanderson accessed, reviewed, copied, and deleted spreadsheets, emails, and other material containing Lytx Confidential Information from his Lytx laptop.  (Cross Dec. ¶ 42; Lurie Dec. ¶¶22-24; Declaration of Geoffrey A. Brown ("Brown Dec."), attached as **Exhibit D**, ¶¶ 15-16, 18, 20-26.)

7.      Sanderson's access to, knowledge of, and use of the Confidential Information Lytx developed and created over many years will give Sanderson (in his new position at SmartDrive) an unfair business advantage.  Specifically, it will allow him to anticipate Lytx's every move by targeting Lytx clients and prospective clients, undercut Lytx pricing, help SmartDrive target Lytx top-performing sales employees, develop sales strategies, and offer similar products and programs in the future that SmartDrive otherwise would not be able to develop and offer so quickly – if at all.  (Lurie Dec. ¶¶ 8-12, 26.)

8.      Lytx brings this action to preserve the *status quo*.  Lytx requires immediate injunctive relief to protect it from the harm of losing business to Sanderson and SmartDrive as a result of Sanderson improperly using or disclosing Lytx's Confidential Information.  It also requires immediate injunctive relief to secure the return and stop the dissemination of its Confidential Information.  (*Id.* ¶¶ 8-12, 26, 28.)

9.      Lytx also seeks recovery of all damages it has incurred as a result of Sanderson's unlawful actions, including all costs associated with trying to recover its Confidential Information, all costs relating to its efforts to protect its client relationships, including litigation costs and attorneys' fees, and repayment of the sign-on bonus Sanderson received during the first year of employment.

**THE PARTIES**

10.     Lytx is a Delaware corporation, with its corporate headquarters and principal place of business at 9785 Towne Centre Drive, San Diego, California 92121.  Lytx was formerly known as DriveCam, Inc. and changed its name to Lytx in November 2013.  (Cross Dec. ¶ 4.)

11.     Sanderson is an individual, an Illinois citizen, who is last known to reside at 8331 South Wabash Avenue, Chicago, Illinois.  (*Id.* ¶ 7.)

**JURISDICTION AND VENUE**

12.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Lytx and Sanderson and because Lytx seeks damages in excess of $75,000.

13.     This Court also has subject-matter jurisdiction over this action pursuant to the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*

14.     Lytx's related state-law claims fall within this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2) in that Sanderson resides in this district, and all or a substantial part of the events giving rise to Lytx's claims occurred within this district.

**BACKGROUND AND COMMON ALLEGATIONS**

**<u>Sanderson's Employment with Lytx</u>**

16.     On or about December 13, 2013, Lytx hired Sanderson to work as an Enterprise Sales Director beginning January 6, 2014.  Sanderson was responsible for developing new clients and was held to quarterly performance metrics.  Lytx expected Sanderson to attend meetings with potential and actual clients, conduct trials of Lytx products and services, provide input into

new products and services, and obtain subscriptions for the Lytx solution.  (Cross Dec. ¶ 7; Lurie Dec. ¶¶ 5-6.)

17.     At the time of his resignation, Sanderson reported directly to Rob Bartels, Senior Vice President, Trucking Commercial Leader.  (Cross Dec. ¶ 9.)

18.     During his employment, Sanderson worked within Lytx's trucking group, which solicits business from trucking fleets and companies, to target his assigned clients and potential clients.  (Lurie Dec. ¶ 6.)

19.     Sanderson worked remotely, based out of his home in Illinois, and Lytx provided him with, among other things, a laptop, iPad, projector, camera, and wireless hot spot. Sanderson accessed Lytx's company server via his laptop.  (Cross Dec. ¶ 8.)

20.     Lytx paid Sanderson an annual base salary and he was eligible to earn commissions based on his performance, as outlined in the Lytx Enterprise Sales Executive Compensation Plan.  (*Id.* ¶ 10.)

21.     Lytx also paid Sanderson a sign-on bonus of $30,000, which was paid in equal bi-weekly installments over the first year of Sanderson's employment.  (*Id*. ¶ 11.)

22.     Under the terms of Sanderson's offer letter, he agreed to repayment of the sign-on bonus in certain circumstances:

> The sign-on bonus is subject to the repayment obligation described below:
>
> (a)     If your employment with the Company is voluntarily terminated by you for any reason or by Lytx for cause (a "Termination") within 24 months after the Start Date, you agree to re-pay to the Company the sign-on bonus amounts paid to you in full.
>
> (b)     Repayment is required within thirty (30) days of the Termination date. Failing [sic] which you specifically authorize the Company to deduct the full amount from any commission payments owed to you at the time of your termination or thereafter.  Any portion of the sign-on bonus that remains unpaid after the thirtieth (30th) day after your Termination shall bear interest at a rate of 1.5% per month or the maximum allowable under the law, whichever is lower. (*Id.* ¶ 12.)

23.     Sanderson executed the offer letter, "a legally binding contract" for the sign-on bonus, on December 13, 2014.  (*Id.* ¶ 13.)

24.     At the time of his hire, Sanderson also acknowledged receipt of Lytx's Employee Handbook and agreed to abide by the policies set forth in the Handbook, including the Confidentiality and Proprietary Information policy which states, in relevant part:

> During the course of your employment, you may have access to, learn of or come into confidential information that belongs to DriveCam, Inc. or DriveCam, Inc.'s customers, or others.  All such information is strictly confidential and may not be disclosed to anyone outside of DriveCam, Inc., including disclosure to family members, without the written consent of one of the principals of DriveCam, Inc. **This obligation to safeguard information exists both *during* employment and *after* employment ends.**  If you have any doubt that information is confidential, all such doubt should be resolved by treating the information as confidential.  Any questions regarding the confidentiality or non-confidentiality of information should be directed to the Human Resource Department.
>
> All writings that contain confidential information that are prepared by you, or otherwise come into your possession during you reemployment, are and will remain the property of DriveCam, Inc.  **When requested by DriveCam, Inc. or when you leave DriveCam, Inc., you must immediately return to DriveCam, Inc. all writings and other tangible things that are in your possession or control, including any copies.  This includes any electronic information or data that you may have in your possession or control.**
>
> All employees shall protect DriveCam, Inc.'s confidential or proprietary information against improper use and access and shall not use any confidential or proprietary information outside of the context of the employee's official DriveCam, Inc. duties.  Employees shall not remove DriveCam, Inc.'s records or documents from the premises or use such documents or information for personal gain or benefit. (*Id.* ¶¶14, 16 (emphasis added and in original.).)

25.     The Handbook also contained a policy requiring employees to return all company property, including software, computer equipment, databases, files, etc. upon separation.  (*Id.* ¶ 17.)

26.     Lytx defined "Confidential Information" in the Handbook as "any information relating to [the Company's] business activities, client accounts, representatives information, marketing and sales programs, financial projections, pricing formula, business plans, personnel

data, product research and development, trade secrets, computer programs, security procedures and any results of the company's work which is not generally known outside the company and has not been disclosed to the public by an authorized representative of the company." (*Id.* ¶ 15.)

27.     Lytx policy requires employees to execute a Proprietary Information and Inventions Agreement, which essentially memorializes the Confidentiality and Proprietary Information policy to which Sanderson agreed in the Lytx Handbook.  Lytx presented that Proprietary Information and Inventions Agreement to Sanderson at the start of his employment, and requested that Sanderson execute it and attest to his understanding of, and agreement to, the requirement for confidential treatment of confidential information.  (*Id.* ¶¶ 18-19.)

28.     As of the filing of this lawsuit, Lytx has not been able to locate a copy of the Proprietary Information and Inventions Agreement executed by Sanderson.  Its investigation is ongoing.  (*Id.* ¶ 19.)

29.     In addition, Sanderson, like all new employees, received training through Lytx's new hire orientation about protecting Lytx's Confidential Information.  (*Id.* ¶ 20.)

30.     Shortly after Sanderson began working for Lytx, Sanderson's previous employer, Rand McNally, contacted Lytx to remind Lytx of Sanderson's obligations to maintain the confidentiality of, and not disclose, Rand McNally's confidential and proprietary information and/or trade secrets.  As a result, Lytx gave Sanderson specialized training, which included a clear directive that he was not to use any Rand McNally information in his work for Lytx, and that he was not to disclose at any time any Lytx Confidential Information outside of his work for Lytx.  (*Id.* ¶ 21.)

**Lytx Confidential Information**

31.     As Enterprise Sales Director at Lytx, Sanderson had access to and was intimately familiar with Lytx's Confidential Information, including, for example:

a. Information about current Lytx clients, some of which is subject to non-disclosure agreements between Lytx and its clients. For example, driving behaviors of their employees/truck drivers; crash and collision frequency and costs associated with crashes and collisions; vehicle miles traveled; and insurance costs;

b. Master Purchase Agreements ("MPAs") between Lytx and its clients, which include confidentiality provisions that require Lytx and its clients to maintain all information exchanged between them as confidential from any third parties;

c. Pricing information, which under the MPA is treated as "Lytx's Confidential Information" and cannot be disclosed by any clients without Lytx's express written consent;

d. Lytx's customized Return-On-Investment ("ROI") formulas. Lytx created this module from scratch to conduct specialized calculations to measure data on all aspects of a client's operating and insurance costs. This ensures that Lytx pricing and services fulfill that client's unique goals for increased efficiency and compliance;

e. Information on prospective client subscriptions, trial engagements, or pilot engagements with potential clients that Lytx is fostering to build a pipeline of consistent and continuous business expectations for years to come;

f. Roadmaps of intellectual property and product prototypes that Lytx is developing but has not made public; and

g. Lytx's sales compensation metrics, a rubric for variable compensation based on sales numbers that enables Lytx to recruit and retain the top salespeople for its team, and information about Lytx's top sales performers who would be most attractive to Lytx's competitors.[2]

(Lurie Dec. ¶ 7.)

32. Lytx's Confidential Information is valuable to Lytx and would give any competitor – but especially Sanderson's new employer – an unfair competitive advantage. This would be immeasurably damaging to Lytx to an extent not quantifiable in dollars and cents. (*Id.* ¶¶ 8, 13, 26.)

33. For example, using Lytx Confidential Information, Sanderson (in his new position at SmartDrive) could provide:

---

[2] Because these documents are confidential and proprietary in nature, Lytx cannot describe them in greater detail or file them on the ECF system; however, Lytx will provide copies to the Court for *in camera* review at the Court's request.

      a.     An in-depth understanding of how Lytx's strategic and marketing plans work by precisely determining client needs using the customized ROI formulas and specialized pricing calculations;

      b.     Specific proprietary and confidential information regarding clients Lytx is targeting and working with, and the trials and pilot arrangements Lytx offers potential clients to build relationships and cultivate business;

      c.     A roadmap for the innovations Lytx expects to introduce into the marketplace that are not currently available to clients, including the FlexFocus prototype, for example; and

      d.     Insights into Lytx's employee-recruitment and retention techniques to allow its competitors an inside track to attracting Lytx's top sales performers.

(*Id.* ¶¶ 9-12.)

34.     In other words, Sanderson has the know-how on all the research, ideas, budgets, designs, strategies, plans, materials, and other Confidential Information that Lytx has developed, and can use it to his and SmartDrive's advantage. (*Id.* ¶ 26.)

**<u>Lytx's Investment in Its Confidential Information</u>**

35.     Lytx has developed its Confidential Information at great expense over a number of years of market research, product research-and-development initiatives, relationship-building with existing clients, and outreach to potential clients. (*Id.* ¶ 13.)

36.     For example, the time between first contact with a potential client and a signed subscription often involves a team of staff and it can take well over a year (sometimes several years) to cultivate a cycle of ongoing business. (*Id.*)

37.     As another example, to build a new product from scratch to introduce in the marketplace could take, for example, over a year and millions of dollars from initiation of the idea to launching the solution publicly. (*Id.*)

38.     Monetary damages could not adequately compensate Lytx for the time and resources it has invested in its business development, product development, and employee development over the course of its existence. (*Id.* ¶¶ 8, 13.)

**Lytx's Reasonable Efforts to Protect Confidential Information**

39.     Lytx Confidential Information is not generally known in the industry and is valuable because Lytx derives economic value from the information, in part, because such information is not publicly available.  (*Id.* ¶¶ 7, 11.)

40.     Lytx has taken and continues to take reasonable and appropriate steps to maintain the secrecy of its Confidential Information, including:

   a.     Lytx implemented a Confidentiality and Proprietary Information policy and requires all employees to review and abide by the policy;

   b.     It is Lytx's policy to require employees to execute a Proprietary Information and Inventions Agreement that contains additional confidentiality protections;

   c.     Lytx provides training as part of new-employee onboarding regarding Confidential Information, its policy regarding such information, and employees' obligations with respect to such information, even upon separation from Lytx;

   d.     Lytx proprietary data and material can only be accessed through a username and password-protected software system;

   e.     Certain client information is only circulated and available to employees on a need-to-know basis;

   f.     Lytx's Document Marking Policy requires that documents containing confidential and proprietary information be appropriately marked as "Confidential";

   g.     Lytx requires clients to enter a non-disclosure agreement before it provides in-depth roadmaps for implementing Lytx products and services; and

   h.     Trade secrets are kept in segregated databases with access protected by a unique username and password, and access limited to those who need to know the information.

(Lurie Dec. ¶ 14; *see also* Cross Dec. ¶¶ 14-21.)

**Sanderson's Separation from Lytx**

41.     On or about January 19, 2015, 12 days after Sanderson received the final installment of his $30,000 sign-on bonus, Sanderson resigned unexpectedly in an email to Rob Bartels, SVP, Trucking Commercial Leader.  (Cross Dec. ¶ 22; Lurie Dec. ¶ 16.)

42.     Lytx promptly terminated Sanderson's access to Lytx's company server, and began forwarding Sanderson's work emails to Bartels.  (Cross Dec. ¶ 23.)

43.     After receiving Sanderson's email on January 19, 2015, Bartels responded and asked Sanderson for a time to discuss.  Sanderson responded and said he would call Bartels, but never did.  Over the next few days, Bartels continued attempting to contact Sanderson by telephone to discuss his resignation and the return of his company laptop, iPad, and other Lytx property, but Sanderson did not respond to his telephone calls and text messages.  (Cross Dec. ¶ 24; Lurie Dec. ¶ 17.)

44.     On or about January 20, 2015, Lytx received information that Sanderson planned to join SmartDrive, one of Lytx's direct competitors.  (Cross Dec. ¶ 25; Lurie Dec. ¶ 18.)

45.     In fact, Lytx later learned Sanderson had accepted (in writing) a position with SmartDrive on January 14, 2015 – five days *before* he resigned from Lytx.  (Cross Dec. ¶ 45; Lurie Dec. ¶ 25.)

46.     On or about January 21, 2015, Bartels left Sanderson another voicemail, this time referencing Sanderson's move to SmartDrive and emphasizing the importance of returning Lytx company property and establishing his final date of employment with Lytx.  (Cross Dec. ¶ 26.)

47.     After Sanderson did not respond to Bartels' calls and emails, on or about January 26, 2015, Tonya Cross, Senior Vice President of Human Capital, emailed and delivered a letter to Sanderson via FedEx: (1) requesting repayment of the $30,000 sign-on bonus within thirty (30) days, per Sanderson's offer letter; (2) demanding the return of all Lytx property, including "the Lytx laptop, iPad, hot spot, projector, equipment, documents, files, confidential information, trade secrets and proprietary information" in Sanderson's possession; and (3) stating that in light of Sanderson's failure to provide Lytx with an effective date of resignation, his termination date would be January 23, 2015.  (*Id.* ¶ 27.)

48.     Cross's letter expressly stated, "In returning the Lytx-issued computer and ipad, you must do so without transferring, copying, printing, opening, or otherwise accessing the files contained on the computer or ipad." (*Id.* ¶ 28.)

49.     Cross's letter also reminded Sanderson of his obligations to Lytx with respect to its Confidential Information:

> We are reminding you that your obligation of confidentiality remains in effect even after your employment with Lytx terminates and remain obligated to: (a) hold in trust, keep confidential, and not disclose to any third party (including a new employer) or make any use of the Confidential Information of Lytx; (b) not cause the transmission, removal, or transport of Confidential Information of Lytx; (c) not publish, disclose, or otherwise disseminate Confidential Information of Lytx; and (d) return all property of Lytx. We recognize that it may be tempting to use Lytx information at a new employer. However, please understand that you are prohibited from using or disclosing any Confidential Information or trade secrets of Lytx even if it is possessed solely in your memory. Thus, to protect both you and your future employer, you should not use Lytx Confidential Information (including client or protect [sic] and contact information) or disclose such information to your new employer or any competitor. (*Id.* ¶ 29.)

50.     Cross asked Sanderson to contact her "right away" on her cell phone. (*Id.* ¶ 30.)

51.     The next day, on or about January 27, 2015, Sanderson replied to Cross' email as follows: "I received your email and letter. I will be contacting you today to work through details. Thank you for your assistance. This is not an easy decision." (*Id.* ¶ 31.)

52.     But Sanderson never called Cross on or about January 27, 2015. On or about January 28, 2015, Cross emailed Sanderson again to arrange a telephone call regarding his resignation and the return of his Lytx computer and other company property. (*Id.* ¶ 32.)

53.     Sanderson replied via email and explained he "lost a close friend Friday and this week has been a blur." Sanderson also requested to speak with both Bartels and Cross regarding his separation from Lytx. Cross agreed to arrange the telephone call, but notified Sanderson that a courier would arrive at his home address on January 29, 2015 at 1:00 p.m. to collect the Lytx property in his possession, including the laptop. (*Id.* ¶¶ 33-34.)

12

54.     That same day, the courier (an employee of Berkley Research Group, LLC ("BRG")) contacted Sanderson by telephone to confirm pick-up of the laptop, iPad, and other Lytx property at Sanderson's home.  Sanderson told the courier that he would instead drop off the items at the courier's office.  The courier agreed to meet Sanderson on January 29, 2015 at 1:00 p.m. CST at its office located at 181 West Madison, Suite 2950, Chicago, Illinois.  (Brown Dec. ¶¶ 7-8.)

55.     On January 29, 2015 at 11:22 a.m., Sanderson emailed Cross and told her that his cellphone "crashed" and asked for the courier's contact information.  (Cross Dec. ¶ 35.)

56.     At approximately 12:44 p.m. that day, Sanderson contacted the courier and said he was "running late" because his "cellphone was stolen."  Sanderson did not deliver the laptop, iPad, and other Lytx property until 2:06 p.m. CST.  (Brown Dec. ¶ 9; Cross Dec. ¶ 36.)

57.     On or about January 30, 2015, Sanderson spoke with Cross and Bartels on the telephone.  During the call, Sanderson affirmatively stated that he did not access any Lytx material or emails after he resigned his employment on January 19, 2015, and only used the laptop to access Facebook after his resignation.  Sanderson also acknowledged he owed Lytx the $30,000 sign-on bonus per the terms of his offer letter and agreed Lytx could offset the amount owed with any unpaid commissions.  (Cross Dec. ¶ 37.)

58.     During this telephone call, despite the fact that Sanderson had already formally accepted a position with SmartDrive (on January 14, 2015), he told Cross that he had two job offers and he was only 95% sure he was going to work at SmartDrive.  (*Id.* ¶¶ 38, 45-46.)

59.     At the end of the call, Cross again reminded Sanderson of his obligations regarding Lytx Confidential information and discussed hypothetical scenarios where the information may inadvertently be used or disclosed.  Sanderson assured Cross that he "would never" reveal Lytx confidential information, even if SmartDrive asked him to.  (*Id.* ¶¶ 39, 46.)

**Sanderson's Unlawful Activity and Misappropriation of the Confidential Information**

60.     Lytx retained third-party forensic vendor, BRG, to perform a forensic examination of Sanderson's laptop and iPad.  (Brown Dec. ¶ 6; Cross Dec. ¶ 40; Lurie Dec. ¶ 21.)

61.     Between January 30 and February 13, 2015, BRG conducted a forensic analysis of Sanderson's company-issued laptop and iPad, and provided its findings to Lytx.  (Brown Dec. ¶ 13.)

62.     The forensic analysis shows that on January 28 and 29, 2015 in the hours and minutes before Sanderson returned his laptop, Sanderson transferred material onto two USB flash-drives and one external hard-drive, deleted the contents of the "Desktop" and "Documents" folders (as well as all other working user files), deleted his Lytx email, and attempted to copy his Lytx email.  (Cross Dec. ¶ 42; Lurie Dec. ¶ 22; Brown Dec. ¶¶ 15-16.)

63.     BRG analyzed certain registry files and log files that contain evidence of USB and external-storage devices that had been plugged into the system.  These high-capacity storage devices are typically used to transfer files from one computer to another.  (Brown Dec. ¶ 17.)

64.     The forensic examination showed that between January 28, 2015 at 11:05 p.m. CST and January 29, 2015 at 12:22 p.m. CST, Sanderson plugged two flash-drives and one external hard-drive into his company-issued laptop ("the USB Devices"):

      a.     On January 28, 2015 at 11:05 p.m. CST, a generic USB flash-drive with internal serial number FBG1207171012457 was plugged into the laptop;

      b.     On January 29, 2015 at 11:02 a.m. CST, a Toshiba USB external drive with internal serial number 2012081526881 was plugged into the laptop;

      c.     On January 29, 2015 at 12:22 p.m. CST, a PNY USB 2.0 flash-drive with internal serial number 0060E04DEF33AC50E2CF3BA4 was plugged into the laptop.

(Brown Dec. ¶ 18; Cross Dec. ¶ 42.)

65.     To ascertain the contents of those USB Devices, BRG also analyzed specific forensic artifacts found in Sanderson's computer profile and registry.  These artifacts are created when files or folders are opened and typically will only provide a partial indication of the contents of the drive, as not all files and folders are opened by the user after a copy event. (Brown Dec. ¶¶ 19-20.)

66.     The forensic artifacts indicated the following files and folders identified in Table (1) below had been either created or opened during the time the USB Devices listed above were plugged into the Lytx laptop:

**Table (1): Evidence of files or folders existing on USB Devices used on January 28-29, 2015**

| Ref # | Path on USB external drive |
| --- | --- |
| 1 | D:\c156343\ |
| 2 | D:\c156343\Contacts\ |
| 3 | D:\c156343\Desktop\ |
| 4 | D:\c156343\Desktop\Presentation Material\ |
| 5 | D:\c156343\Documents\ |
| 6 | D:\Contact 1.txt |
| 7 | D:\Contacts.vcf |
| 8 | D:\New folder\ |
| 9 | D:\Search\ |
| 10 | D:\TMW Systems Literature\ |

(Brown Dec. ¶ 20.)

67.     BRG's examination further showed that between 11:16 a.m. CST and 1:18 p.m. CST on January 29, 2015 (the minutes and hours just before Sanderson finally delivered the laptop to the courier) Sanderson engaged in a significant amount of activity, including deletion, activity with USB Devices, and attempts to export email/Calendar or Contacts:

        a.      At 11:16 a.m. CST Sanderson moved over 1,000 files and folders to the recycle bin in preparation for deletion.  The files included the contents of two folders, "Desktop" and Documents," where Sanderson stored his Lytx files.

        b.      At 11:36 a.m. CST, Sanderson emptied the recycle bin.  The effect of emptying the recycle bin is that the files are permanently deleted.  For a typical user,

there is no evidence of what was deleted and/or when this occurred. But computer-forensic techniques allow for recovery of some deleted files with time-stamps indicating when they were deleted from the recycle bin.

      c.    At 11:36 a.m. CST, Sanderson browsed a previously plugged-in external drive, which created evidence of some folders existing on the drives (which are identified in Table (1) above. As of the date of this Complaint, BRG has not located evidence of the contents of the folders as it appears no files were opened; however, the folders "Desktop", "Documents" and "Presentation Material" all existed on the Lytx laptop before Sanderson deleted them. It is therefore likely that Sanderson copied these folders and their complete contents to a USB device.

      d.    At 12:32 p.m. CST, Sanderson created a PST file. A PST file is created by the application Outlook (which is the program Lytx uses for email, calendar and contacts). A typical use of a PST file is to make a backup copy of email, contacts, or calendar items. The file was last written to at 1:17 p.m.; however, it only contained empty folders from Sanderson's mailbox. It is possible this was a failed attempt by Sanderson to export items from Outlook. Additionally, during this time Sanderson moved an OST file (which is an Outlook file that is created by default and contains a copy of the online mailbox) to the recycle bin and then deleted it.

      e.    At 12:42 p.m. CST, Sanderson accessed the USB drive again, and there is evidence that it was plugged into the laptop during the majority of the above activity.

(Brown Dec. ¶ 21; Cross Dec. ¶¶ 42, 43.)

    68.    Further examination and investigation showed that Sanderson nearly entirely purged his mailbox on the Lytx Office 365 server on or before January 19, 2015. Sanderson permanently deleted emails in his Inbox dated before January 19, 2015 (except for one email that Sanderson received on January 10, 2015). Sanderson permanently deleted emails in his Sent Mail dated before January 19, 2015 (except for 32 emails that Sanderson sent between January 14, 2014 and January 18, 2014). Lytx contacted Microsoft to try to recover the content of the deleted emails, but Microsoft confirmed that it cannot recover the content of the emails and does not allow for recovery from backups. (Brown Dec. ¶ 22.)

    69.    Although Sanderson deleted the contents of the emails from the laptop and mailbox on the Lytx server, a log of outbound emails identified that Sanderson sent emails to his

personal Hotmail email account (*stevesanderson5@hotmail.com*).  Table (2) below identifies the

three emails, which based on their size and subject, appear to contain scanned attachments:

**Table (2): Evidence of emails from *ssanderson@lytx.com* to *stevesanderson5@hotmail.com* with scanned attachments between January 12 and January 15, 2015**

| Ref # | To | From | Subject | Sent Date | Size MB |
|---|---|---|---|---|---|
| 1 | stevesanderson5 @hotmail.com | ssanderson @lytx.com | Scan Jan 12, 2015, 10.21 AM | 1/12/15 08:25 | 4.58 |
| 2 | stevesanderson5 @hotmail.com | ssanderson @lytx.com | Scan Jan 14, 2015, 4.31 PM | 1/14/15 14:33 | 0.81 |
| 3 | stevesanderson5 @hotmail.com | ssanderson @lytx.com | Scan Jan 14, 2015, 4_31 PM-page1 | 1/15/15 08:54 | 0.1 |

(Brown Dec. ¶ 23.)

70.     As a result of the evidence of mass-deletion, BRG conducted further analysis to

identify the files and folders that had been deleted.  One of the features of the Windows 7

operating system allows the creation of historical backups of all files and folders on the drive.

These backups are called volume shadows, which reside on the drive and are hidden from most

users.  (Brown Dec. ¶ 24.)

71.     BRG reviewed the contents of the last backup on the drive which was created on

January 27, 2015, and identified approximately seven Lytx folders and approximately 100 Lytx

files that were present on January 27, 2015 but later deleted.  Some examples are described

below in Tables 3 and 4:

**Table (3) – Example of folders deleted from "Desktop"[3]**

| Ref # | Foldername and path |
|---|---|
| 1 | D:\c156343\Desktop\Presentation Material\ |
| 2 | D:\c156343\Desktop\Proposals\ |
| 3 | D:\c156343\Desktop\ROI 2\ |
| 4 | D:\c156343\Desktop\ROI calc\ |
| 5 | D:\c156343\Desktop\Trucking Sales Deck\ |

---

[3]  At the Court's request, a complete list of folder and file names can be provided for *in camera* review.

**Table (4) – Example of files deleted from "Desktop"**

| Ref # | Filename and path |
|-------|-------------------|
| 1 | D:\c156343\Desktop\DC Highway – FlexFocus Prototype.pdf |
| 2 | D:\c156343\Desktop\DC Highway – FlexFocus Prototype.pptx |
| 3 | D:\c156343\Desktop\Trucking ROI Template 20140127.xlsx |
| 4 | D:\c156343\Desktop\Copy of Copy of Sanderson 1Q15-2Q15 Forecast Sheet3final.xlsx |
| 5 | D:\c156343\Desktop\Copy of GL Region Key Accounts.xlsx |
| 6 | D:\c156343\Desktop\Copy of Steve Sanderson Fcst 4Q14-1Q15Version1.xlsx |

(Brown Dec. ¶ 25.)

72.     The contents of these folders and files at the time they were last backed up to Lytx's server on January 27, 2015, shows that Sanderson downloaded and then permanently deleted Lytx's Confidential Information including:

a.     Sales forecast spreadsheets showing data about potential clients with whom Lytx had ongoing trials, and a list of potential and actual clients from Sanderson's assigned territory with names and contact information for each client target in that geographic region.   With this information, Lytx's competitors would have insider knowledge of Lytx's actual and potential clients;

b.     Numerous customized ROI formulas that are Lytx's intellectual property, created from scratch to conduct specialized calculations that measure data on all aspects of a client's operating and insurance costs to ensure that Lytx pricing and services fulfill that client's unique goals for increased efficiency and compliance.  This formula would be of great value to Lytx's competitors because it would allow them to replicate Lytx's formula that Lytx expended significant time and resources to build;

c.     The plans for a product prototype – Lytx's intellectual property – for a new innovative solution that Lytx has not yet released to the public;

d.     MPAs, seven-page detailed agreements between Lytx and Lytx clients outlining the terms and conditions for Lytx's provision of services and products.  As described above, these MPAs are subject to an express confidentiality provision, as is *all* of Lytx's client information pursuant to the MPA;

e.     Confidential Price Quotes showing the terms and conditions and pricing.  As discussed above, typically individual client pricing is not publicly known.  Clients are not allowed to share Lytx pricing arrangements with others.  This information gives both Lytx and its clients a competitive edge over their respective competitors;

f.     Client Presentations including slides designed by Lytx, describing Lytx's unique processes and methods for servicing clients, and including data Lytx researched

and mined.  Under Lytx's Document Marking Policy, each of these presentations should have been labeled and treated as "Confidential and Proprietary"; and

g.      Lytx's 2014 Sales Compensation Plan for Enterprise Sales Executives, an 11-page document outlining Lytx's confidential, detailed compensation plan, which Lytx uses to maintain a competitive edge in recruiting and retaining its top talent through unique performance-based compensation metrics.

(Lurie Dec. ¶¶ 23-24; Cross Dec. ¶¶ 43, 44.)

73.      The evidence listed in the previous paragraphs demonstrates that since his resignation on January 19, 2015, Sanderson has engaged in a campaign to intentionally access and misappropriate Lytx Confidential Information.  (Lurie Dec. ¶ 27.)

**Sanderson's Misappropriation of Lytx's Confidential Information**

74.      As outlined in the allegations above, Sanderson has misappropriated Lytx's Confidential Information.  He engaged in this conduct to succeed in his new sales role at SmartDrive.  He will use it to entice Lytx clients and prospective clients to withdraw their business from Lytx, and award it to SmartDrive by, among other things, undercutting Lytx's pricing, developing and rolling out similar and competing products and services, focusing on Lytx's target areas of business, and trying to take over Lytx's pipeline.

75.      As outlined in the allegations above, Sanderson also knew that he and SmartDrive would need to be able to offer and provide all of the same products, services, materials, and research that Lytx provides to its clients.

76.      Based on Sanderson's LinkedIn profile, it appears Sanderson will likely be performing the same job duties at SmartDrive as he did at Lytx, and because his job will be to differentiate and promote SmartDrive over Lytx, Sanderson is in a unique position to use and disclose Lytx Confidential Information for the benefit of himself and SmartDrive and to Lytx's detriment.

77.     For the reasons outlined in the allegations above, Lytx has no adequate remedy at law.  Allowing Sanderson's actions to go unchecked will irreparably diminish the value of Lytx's Confidential Information, and provide Sanderson, in his new position at SmartDrive, an unfair competitive advantage, with the potential result of SmartDrive stealing business from Lytx, including by underbidding pricing whenever it wants and getting to market quicker with products similar to those Lytx is developing.

### COUNT I[4]
### Violation of the Illinois Trade Secrets Act

78.     Lytx realleges as if fully set forth herein the allegations in the preceding paragraphs.

79.     Lytx's Confidential Information constitutes trade secrets because Lytx derives independent economic value from the information, it is not generally known or readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and Lytx employs reasonable efforts to maintain its secrecy.

80.     The Confidential Information Sanderson has misappropriated is unique to Lytx and not generally known in the industry.  A significant part of its value derives from the fact that it is not generally known by competitors in the industry who could obtain economic value from its disclosure or use.

81.     Sanderson has misappropriated Lytx's trade secrets without Lytx's consent in violation of the ITSA, 765 ILCS § 1065, *et seq.*

82.     Sanderson knew that he acquired, possessed, used, or disclosed Lytx trade secrets in violation of the ITSA.

---

[4]  Lytx's investigation of Sanderson's conduct and its bases for legal relief is ongoing, and Lytx reserves the right to amend its claims as necessary based on its findings.

83.     When Sanderson resigned from Lytx, he lied about his true intentions and ignored Lytx's repeated demands that he return the Lytx property in his possession, including his Lytx laptop.  He also directly contravened Lytx's instruction not to access, transfer, or delete the contents.

84.     Sanderson unlawfully accessed, removed, retained, or failed to return Lytx's trade secrets to benefit himself and SmartDrive.

85.     Sanderson's misappropriation has been willful and malicious in that Sanderson: (a) intentionally accessed and still retains Confidential Information he acquired after his resignation from Lytx by affirmatively logging onto his laptop and entering his login credentials; and (b) intentionally deleted Confidential Information from his Lytx laptop after he transferred the information to his own personal external-storage devices, and forwarded the information to his personal email account.

86.     As a result of Sanderson's misappropriation of Lytx trade secrets, Lytx has been damaged, and faces further irreparable injury should any clients or prospective clients decide to obtain products and services from SmartDrive.

87.     As a result, Lytx is entitled to temporary, preliminary, and permanent injunctive relief to protect its trade secrets and to enjoin Sanderson from using its trade secrets to obtain business in his new position at SmartDrive (or for any other future competitor).

88.     As a result, Lytx has been damaged in an amount to be determined at trial, including punitive damages (765 ILCS § 1065/4(a)(b)).

## COUNT II
## Violation of the Stored Communications Act

89.     Lytx realleges as if fully set forth herein the allegations in the preceding paragraphs.

90.     Since his employment with Lytx ended, Sanderson has repeatedly and intentionally accessed without authorization, or exceeded any authorization to access, Lytx's facilities through which an electronic-communication service is provided (specifically, his Lytx laptop and the Outlook email program and data stored therein).

91.     In connection with that unauthorized access or access that exceeded authorization, Sanderson obtained, altered, or prevented authorized access to electronic communications stored in such systems, in violation of the Stored Communications Act.

92.     Specifically, Sanderson intentionally and repeatedly accessed, transferred, and deleted email messages and other Lytx material in his Lytx email account on multiple occasions both after he accepted a position with SmartDrive and after his resignation from Lytx, including most recently on January 29, 2015.

93.     As a result, Lytx is entitled to equitable relief to enjoin the unauthorized access and the further use or disclosure of the data Sanderson obtained and stored on other devices during that unauthorized access.  Lytx is also entitled to an award of actual damages and reasonable attorneys' fees and other litigation costs under 18 U.S.C. § 2707.

94.     Sanderson's conduct was and is willful, reckless, and/or intentional, and justifies an award of punitive damages under 18 U.S.C. § 2707(c).

### COUNT III
### Anticipatory Breach of Contract

95.     Lytx realleges as if fully set forth herein the allegations in the preceding paragraphs.

96.     The repayment agreement in Sanderson's offer letter is a valid and binding contract.

97.     Lytx performed all of its obligations under that agreement, including paying Sanderson the sign-on bonus totaling $30,000 in bi-weekly installments throughout 2014.

98.     Sanderson agreed under the repayment agreement to repay the sign-on bonus in full within 30 days if he voluntarily ended his employment with Lytx within 24 months after his start date.

99.     Sanderson voluntarily resigned after just 12 months of employment.

100.     Sanderson acknowledged to Cross that he owed the $30,000 sign-on bonus to Lytx.

101.     Sanderson has refused Lytx's demands to repay the full amount owed, and has indicated that he cannot or will not pay Lytx the full amount owed.

102.     Sanderson has anticipatorily breached the agreement by affirmatively stating that he will not fulfill his obligation to repay the entire sign-on bonus amount to Lytx.

103.     Sanderson's breach has damaged Lytx, in that he has deprived Lytx of the amounts he promised to repay if he resigned during the first two years of his employment.

### COUNT IV
### Conversion

104.     Lytx realleges as if fully set forth herein the allegations in the preceding paragraphs.

105.     As detailed above, after his resignation from Lytx, Sanderson downloaded and transferred Lytx emails, documents, and other material that Lytx created and owns from his company-issued laptop computer to personal external-storage devices.

106.     Sanderson also forwarded numerous emails from his Lytx email account to his personal Hotmail email account after his resignation.

107.     Lytx has an absolute and unconditional right to immediate possession of the Lytx material Sanderson downloaded and transferred to external-storage devices and emailed to his personal email account.

108.     Sanderson knew or should have known that he downloaded, transferred, and emailed proprietary, company-owned material without authorization.

109.     After Sanderson's resignation, Lytx repeatedly demanded the immediate return of its company property and reminded Sanderson of his obligations under Lytx's confidentiality policy.

110.     Sanderson's conduct constitutes conversion of property belonging to Lytx.

111.     Sanderson acted with malice and reckless disregard of Lytx's rights, warranting punitive damages in an amount to be determined at trial.

PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff LYTX, INC. seeks judgment in its favor and against Defendant STEVEN SANDERSON on Counts I through IV, and respectfully requests that this Court enter an Order granting it the following relief:

A.     Under Counts I, II and IV, entering a temporary restraining order, and a preliminary and permanent injunction, against Sanderson and all persons or entities acting in concert with him, enjoining him as follows:

(1)     For as long as the Confidential Information remains confidential, prohibiting Sanderson from using or disclosing such Confidential Information;

(2)     Requiring Sanderson to identify and return to Lytx any and all Confidential Information that Sanderson has accessed, used, disclosed, or possessed in any form (paper or electronic), or that is stored on any system or electronic device in the control or custody of Sanderson or any other person or entity affiliated with or acting in concert with or on behalf of Sanderson;

(3)     Requiring Sanderson to provide a sworn statement identifying all Confidential Information that he has retained, accessed, reviewed, or possessed in any form since January 1, 2015, and identifying all persons or entities to whom he has transferred or otherwise disclosed any such Confidential Information;

(4)     Requiring Sanderson to immediately turn over to Lytx all computers, hard drives, USB-drives, external-storage devices, electronic devices, and/or other media in his custody or control or in the custody or control of any

24

other person or entity affiliated with or acting in concert with or on behalf of Sanderson;

(5) Requiring Sanderson to provide a sworn statement identifying all email accounts, cloud-storage accounts, and all other virtual repositories of data, along with login and password information, that he has used or accessed in any way since January 1, 2015; and

(6) Enjoining Sanderson from working for SmartDrive in any capacity, or communicating with any SmartDrive personnel about sales-related matters, until such time as Sanderson has complied with the restrictions and conditions set forth in the previous paragraphs and a forensics vendor has identified, accounted for, and returned to Lytx all Lytx Confidential Information that is currently in Sanderson's possession, custody, or control, and deleted from Sanderson's devices, with no Lytx data remaining available to him or SmartDrive in any format.

B. Awarding Lytx such damages as may be proven at trial, including treble damages under the ITSA and statutory damages under the Stored Communications Act for each violation;

C. Under Counts I, II and IV, awarding Lytx punitive damages;

D. Under Counts I and II, awarding Lytx its costs and attorneys' fees; and

E. Awarding Lytx such other and further relief as the Court deems just and proper in the circumstances.


DATED:   February 17, 2015.                         Respectfully submitted,


                                        By:   /s/ Tobias E. Schlueter
                                              One of the Attorneys for Plaintiff
                                              LYTX, INC.


Tobias E. Schlueter (ARDC No. 6278392)
John L. Hayes (ARDC No. 6275099)
Colleen G. DeRosa (ARDC No. 6301589)
OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
155 North Wacker Drive, Suite 4300
Chicago, Illinois 60606
Telephone: 312.558.1220
*tobias.schlueter@ogletreedeakins.com*
*john.hayes@ogletreedeakins.com*
*colleen.derosa@ogletreedeakins.com*

25

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on February 17, 2015, the foregoing ***Complaint for Injunctive and Other Relief*** was filed electronically with the Clerk of Court using the ECF system, and served via electronic delivery, messenger delivery, and FedEx overnight delivery, upon the following:

Mr. Steven Sanderson
8331 South Wabash Avenue
Chicago, Illinois 60619-4729
*stevesanderson5@hotmail.com*

***Defendant***


   /s/ Tobias Edward Schlueter